May it please the Court, my name is James Kahn, I represent the appellants including Kara Williams in this matter. This Court, or I should add I would like to reserve three minutes of my time for rebuttal. This Court should reverse the District Court's grant of summary judgment because there were two errors, two primary errors. The first is that the District Court did not apply the controlling legal framework for appellants' disparate impact claims. The second is that had it done so, Wells Fargo did not carry its burden to prove business necessity after appellants had successfully made a prima facie showing of disparate impact. So what is this case about? This is a Title VII disparate impact challenge to Wells Fargo's policy of summarily firing or not hiring incumbent employees and conditionally hired applicants who have Section 19 offenses. What's important here is that Section 19 offered Wells Fargo, once it learned that certain of these employees or applicants had Section 19 offenses, a number of options from which they could choose about how to handle these individuals. It did not mandate a specific way, and in fact, Section 19 is a flexible statute that is non-punitive in nature. So how do we know what options were available? Well, we need not look any further than Wells Fargo's prior conduct in treatment of other people with Section 19 offenses. What do those include? Those included giving notice to folks who had Section 19 offenses, whether it was telling them they were being fired because they had a Section 19 offense, telling them that they could get a waiver from the FDIC. Counsel, doesn't this case start with the statute, though? Because what's alleged that the company has done, the company is doing in compliance to federal law. Your Honor, the statute is relevant, absolutely, but because the policy that is being challenged by the appellant here is not Section 19. It is not the need to comply with Section 19. It is rather a more narrow challenge. It is Wells Fargo's exercise of discretion in how it chose to comply with Section 19. And the critical piece about that is that within the parameters of what Section 19 requires and what options Wells Fargo and any other bank has in terms of what do they do when they discover individuals that they have in their employ have Section 19 offenses. They have a number of- It's federal law that decides that the company can't hire them. The federal law, well, under Title VII, the inquiry is what is the policy that's being challenged? We're not challenging whether or not Section 19 applies here or necessarily how it applies, what we're challenging is how does Wells Fargo choose to make sure or implement it, right? And I think what's critical is, you're right, Your Honor, the FDIC will eventually determine if somebody submits a waiver, should they work, are they eligible to go back to work for a bank? That part is undisputed. But when a bank is faced or learns that somebody has a Section 19 offense, they can do any number of things, they can give them notice, they can put them on leave while they go get a waiver. They can sponsor the waiver for those individuals. And in kind of at the most extreme pole of those options, they could summarily fire them. There's a universe of options within the framework of Section 19. So I hear what you're saying, Your Honor, but I think I want to be very clear. We're not asking for alternatives that go beyond what Section 19 permits or allows. We're simply saying that within the discretion afforded by Section 19, Wells Fargo selected summary termination. What does that mean? That means they fired the appellants, many of whom were long standing incumbent workers. How does that have a disparate impact on a minority or on a racial group? Well, Your Honor, we have unrebutted statistical evidence that measured the consequence of that policy. I.e., we looked at all of the individuals that were fired as part of Wells Fargo's summary termination policy. And looked at the differentials in terms of African Americans and Latinos in terms of their exclusion rates versus whites. And what Dr.- But isn't the exclusion itself is not based on race, it's based on convictions. The policy was a choice in terms of excluding or not affording people options under Section 19 that could have facilitated a waiver. Well, how do you know that, what evidence is there that if Wells Fargo had given notice or sponsored all of these people for waivers that the impact would be any different? That's an excellent question, Your Honor. I think as an initial matter, I would say that the court does not need to reach that here. In part because within this Title VII framework, the appellants were responsible to make a prima facie showing of impact. Which they've done with their statistical evidence. No, they've just showed that summary termination has a disparate impact, but not as compared to the practices that you're challenging, that's my question. Well, when it comes to the practices we're challenging, within the Title VII framework, what's important is that if and when we make the prima facie showing like Your Honor mentioned, the burden shifts to Wells Fargo to prove a business necessity and job relatedness. We submit that the record is very clear that they did not pass or carry their burden to prove business necessity because there was no compelling need to summarily fire- But what's your prima facie showing that sponsorship would have changed the impact on any group? I understood you're saying sponsorship results in some people getting waivers. But why is there any reason to believe the waiver process is going to help minorities more than the whites? What we know about the waiver process and what's in the record is a pretty robust series of evidence that, in fact, if folks are given the option of the waiver process or allowed to go through it, that they will almost certainly get waivers if they're incumbent workers, and that there's a very high passage rate. Okay, and to that point- That just means there are fewer people who are excluded, but isn't the ratio of minority to non-minority still going to be the same? No, Your Honor. Well, I think, importantly, so let me answer the first question first, and then I will address that. The evidence of less discriminatory alternative practices include that Wells Fargo sponsored 77 waivers in the past, sometime between 1987 and 1999. Of those, 75 of the 77 were approved. We know that of the six appellants that eventually learned about the need for a Section 19 waiver and availed themselves to it, were all able to get that. For the four other appellants, they have records that are similar to other records that have been approved by the FDIC. We have the expert report of Lieta Hugh, who is an IO psychologist, who examined the performance evaluations that Wells Fargo conducted on an annual basis. That included assessments about both honesty and integrity. All of the performance appraisals that were available indicated that our clients met or exceeded those expectations. And then there's also publicly available information of an exceedingly high passage rate of these FDIC waivers. Now, to your second question, how do we know if that's going to help? And the reality is, is that if we look at, as the non-moving party, kind of the evidence that's most, in a light, most favorable to the appellant. If you look at the 75 out of the 77 sponsored waivers as being a 97% passage rate. If that were to hold true, then in fact there would be a decrease in the disparate impact. Because basically, everybody would get rehired or would be hired in the first instance. Well, if it's 100%, but you haven't really shown that, have you? If the bank says there are people who apply and then drop out before there's a decision, because they see the writing on the wall, so it's really more like 55%. And this is an important point that I wanted to make before, and I think is important to reiterate now. The question of whose burden it is to show that matters in terms of the bigger framework. Our prima facie burden was to show that the policy we were challenging, summary termination, has a disparate impact on African Americans and Latinos. We've done that. I thought you said the practice you're challenging is the refusal to give notice or sponsor waivers. Your Honor, it is Wells Fargo's policy to summarily fire people. And when I say that, that means firing people with no explanation other than to say, a record was found that makes you ineligible for employment with Wells Fargo, full stop. That was the policy that was applied. The alternatives that I'm describing go to the fact that Wells Fargo had other options it could have adopted. It had previously adopted in other situations, but for some reason chose not to adopt or offer to the appellants. And what Title VII says is a very simple mandate. If you can achieve the same business objective, i.e. you can still comply with Section 19 in a multitude of ways, but one of those ways would reduce or mitigate impact, you should pick that one. And as part of that burden, under the business necessity defense, an employer like Wells Fargo has to conduct some kind of search to determine whatever policy they want to implement to make sure that there are no other alternatives that could potentially achieve the same business objective and also potentially avoid impact. Here, Wells Fargo's own witnesses admit they did not do any additional searches or consider any alternatives other than their policy of summary termination. Under this court's very clear framework for Title VII disparate impact claims, under Bradley versus Pizzico and EEOC versus Dial, they fail their burden to prove one of those two elements of business necessity. To your point, Judge Colleton, if they had proved business necessity, then the burden would have shifted back to appellants to prove the existence of less discriminatory alternative practices. But because the record here is so clear that Wells Fargo failed to conduct a search or that they had a compelling need or irrefutable need to summarily fire appellants, given the availability of alternatives that they themselves had previously used, they cannot carry their burden for business necessity, so we don't even get to, or the record hasn't been developed, really, when it comes to other non-discriminatory or less discriminatory options. That was notwithstanding, there is a very impressive amount of evidence, nevertheless, in the record that suggests, if the waiver process were facilitated, if Wells Fargo simply selected any number of options it had previously or otherwise offered, then the impact would likely be reduced. Do you intend to reserve rebuttal? I do, Your Honor. Thank you. Mr. Giudici. May it please the court. Thank you, Chief Judge Smith, and good morning to the court, good morning to the council. Michael Giudicesi and Susan Elgin on behalf of the Appellee, Wells Fargo Bank, NA. This case is not about alternatives. This case is not about Title VII. This case is about Section 19. 12 U.S.C. 1829 made all of the plaintiffs ineligible to work at every federally insured depository institution in the United States from the point of their conviction forward. That is what made them ineligible. That is what defeats their claims under Title VII. They lost their jobs or were not hired because of their convictions for crimes of breach of trust, dishonesty, or money laundering, not because of their race. There is no evidence that they suffered any disparate impact because of a policy of Wells Fargo. If anything, if there was any preliminary showing, it would have only been as to the fact that they lost their jobs. Not because of any practice Wells Fargo could or didn't do, or anything else that Wells Fargo did or didn't do. It was, again, because of their convictions. We think this case should be looked at seriously and only in the context of Section 19. It's text and scope, it's importance, and it's effect. First of all- Why are the alternatives not relevant? Well, first of all, they're confusing alternatives. They've coined the term of summary dismissal, a summary termination. That's a false narrative, Your Honor, because what happened is there was a process that was used by which 31,769 Wells Fargo home mortgage team members were rescreened for criminal convictions. Through that process, 4,700 plus of them had flagged for convictions that implicated Section 19 or other disqualifiers. And 361 lost their jobs because of that. That process involved many people looking at many factors and ultimately determining that they had disqualifying convictions. That is, they were employment ineligible. Now what plaintiffs have tried to do is they've said, okay, because there was a disparate impact on African Americans in that 361, we now have made a prima facie case. But I think your earlier questions exposed that there was no prima facie case made with respect to notices or leave or sponsorship. And in fact, if the court thinks about it, they can't get there because there's missing causation. There's always one thing that has to happen before any of the plaintiffs could come back to work at Wells Fargo. And that is, the FDIC would have to approve a waiver application. And so, if you think of it in terms of proximate cause, if you think of it in terms of a chain of events, there is a break in the chain, there's a break in the causation. But again, what they're trying to say is, well, let us muddy up what Wells Fargo's policy was. Well, I don't understand your causation point. I mean, if they can show that waivers have a 55%, waiver applications have a 55% approval rate, then that means 55% on average of those 361 people would not be fired. Right, but they can't show that, I think your question was, would they be able to show that African Americans were more favored through that process? They can't get there. But my causation, I'm sorry, I'm talking over you, I apologize. His answer to that was that you have to show a business necessity before the analysis goes to a comparison of alternatives. What do you say to that? If he had established a prima facie case, that there was disparate impact based on a failure to give notice, or disparate impact based on a failure to provide a sponsored waiver. If he had shown that, then you'd go to the second step of Ward's Cove. But he didn't show that. All they showed was that there was a disparate impact by people losing their jobs through what they called summary dismissal. So again, they're trying to have it both ways. They're trying to say, the policy is summary dismissal, and the alternative is something that we'll get to later. But then they say, well, no, the policy is the failure to give these. Let me also just discuss for a moment this idea that there's no business necessity. Judge Hanson, when he was at the district court, had one of the few section 19 cases involving the FDIC suing for an injunction to have a person at the bank who employed an ineligible person, it continued to employ that person, so the FDIC sued. The FDIC wanted an injunction to bar that individual from continuing to work at an FDIC insured depository institution. And in granting the injunction to the FDIC, Judge Hanson found that there was no need to show irreparable harm. What he said was that the statute itself, the fact that Congress had dictated that there was going to be a need to remove the individual, that was all that needed to be shown. We think the same applies here. There's nothing more that's necessary to show need than the statute itself. The statute says an individual cannot be hired or retained by a federally insured depository institution if that individual has a disqualifying crime for breach of trust, dishonesty, or money laundering. All the plaintiffs had that. And so the fact that the statute existed, and the statute also says that they cannot continue in the employment of an institution. And the regulations or the pronouncements of the FDIC say that you can't continue to employ a person during the pendency of an application for consent. So, you look at all this and you say, that on its face is need. What are the consequences to Wells Fargo if it were not to discharge the individuals? The potential consequences, Mr. Kahn says it's a flexible standard. It's a standard that imposes a $1 million a day fine and the potential for jail terms of five years. And that standard is not only applied to the bank, it's applied to the employee. So, long-winded answer to your question, Judge Carlson, what is the evidence of irreparable harm? I'm sorry, the evidence of compelling need or reasonable need, whatever the need standard might be. It's the statute. The statute and its $1 million a day fine, the statute and its five year imprisonment. If this court were to go with what plaintiffs urge or what the appellants urge, you create a Hobson's choice for every insured institution. I think what he's arguing is, there's no $1 million fine for giving advance notice. Well, there's also case- Sponsoring a waiver. You can do those things without violating the statute. But there's no requirement in the statute that you do them. There's no requirement in most- I'm saying there's a requirement under Title VII that you do them because it avoids a disparate impact of doing it the way Wells Fargo's doing it. Again, let me go back to that. If his challenge is that the policy, again, his definition of summary termination, is this failure to give notice. Then he lacks any evidence in this record showing that the protected class members were disparately impacted by the failure to give notice. Because what he has is that they were disparately impacted by their criminal convictions and disqualification. But nothing about the failure to give notice. Now, let me- No evidence in the record say that blacks are more likely to get a waiver than whites? There is nothing in that record. And how could there be? Because again, every- I don't know what the evidence would show empirically, whether the FDIC, for some reason, tends to give more waivers to one group or another. Well, first of all, there is no record to that effect. Secondly, it's hard to imagine that the FDIC would be able to engage in either discriminatory action or affirmative action in granting waivers. And most of all, this idea that there's a requirement for notice. If you look at the EEOC's massive pronouncement on use of criminal conviction records in employment, it talks about how laws like section 19 immunize employers from the disparate impact and the disparate treatment claims. And it specifically says, in a section that deals with waivers, that an employer need not sponsor a waiver, need not proceed to get a waiver. So they're creating this- Voting from there? It's the EEOC's guidance on arrests and convictions. And it's- I did wonder, even if, I did wonder from the plaintiff's point of view, how you could tell whether the bank would sponsor any particular person, even if it had a policy that allowed for sponsorship. We assume it wouldn't be a blanket sponsorship of everybody who's been convicted of money laundering. I guess that's the next case, though, Your Honor. If you go with plaintiffs here, then the next case is, well, the court chose to sponsor waivers, and that because it didn't uniformly do it, it did it based on the nature of the conviction of the crime. So some section 19 crimes are worse than others, I don't think there's a standard for that. If I might read for you just what the EEOC guidance says. While Title VII does not mandate that an employer seek such waivers, where an employer does seek waivers, it must do so in a non-discriminatory manner. And so there, you do it at your risk. And if you think about this, if you had 4,000 some people that were implicated in this process, how could Wells Fargo go forward, how could any employer go forward with the waivers? The waivers, we have information in the record, that a waiver takes about 16 hours according to federal government guidance. If you look at the waivers that are in the record, they include information. There are waivers that were sought by some of the plaintiff appellants. And if you look at that, the sponsorship of a waiver is something that is in many ways invasive of a personal prerogative of an individual, whether they want to seek it or not. And it requires references, it requires detailed financial information, it requires evidence that there's no likelihood of recidivism. It requires evidence of good conduct. There are all these things that those certainly should be the choices of the individual. And the individual- I understand that the individual now can apply for a waiver without the bank's sponsorship, right? Indeed, and that's an important- Is there any evidence that sponsored waiver applications are more likely to be successful than individual applications? I'm not aware if it's in the record. I'll let Mr. Kahn point it out to you. If it is, I don't believe that there's evidence in this record saying sponsored waivers receive any greater attention or grants. I might note that that point that you raise about that individuals are now able to apply for waivers is important because he cites the appellant's site information that they say from 1998, back in 1998, Wells Fargo sponsored applications. And the response to that's very important. In 1998, the only method by which anyone could get a waiver was if a bank sponsored it. The FDIC then changed its processes and allowed individuals to pursue waivers. And so from 1998 forward, when that change was made, there's no evidence that Wells Fargo ever sponsored a waiver for anyone. Has Wells Fargo ever had a policy of advising employees of the availability of individually sought waivers? I don't think that there was a policy for or against it. I think that it may have been done on an ad hoc basis. But this record does not show that there was a policy to advise people or to withhold that information. But there is in the record, there's the employee handbook information, which in several places talks about section 19. It calls it FIREA after the changes in the legislation in 2007 or 2008. And after that financial reform act, there's reference to FIREA. And what it says in the handbook is that you may be ineligible under FIREA if you have a crime for breach of trust, dishonesty, or money laundering. It says you may be what? You may be ineligible for employment. And so it doesn't say the next- It's not got to do with waivers. But the idea of notice, there's not a prescribed form. I thought the question was notice that there's a way to avoid ineligibility. Well, it tells you about your analogy, but again, I'm sorry for the indirect way of getting to the answer. The answer is that an individual certainly has the ability by looking at the handbook to say, well, what's FIREA? And they can go to Google and put in FIREA, or they can go into Google and put section 19, and they can find out everything they want to find out. We have testimony in the record that Wells Fargo didn't do that, but we also have case law. If you look at the Malin case, which is from, again, Judge Hanson in the Northern District of Iowa. He said notice was not necessary. He said it wasn't necessary for a very important reason. That the person who has been through a criminal proceeding and a conviction has had notices of all kinds of things throughout the process. And as we argue to the district court, and we think it's important to note here, this idea of notice. That, again, is not going to make somebody eligible when they're not. It takes FDIC approval. And the other part about notices, people don't get notices about all kinds of laws. We're assumed, we're charged with knowledge of the law. It's not an employer's duty to tell employees to file their taxes. It's not their duty to tell them not to speed on the way to work. Well, sometimes you have to tell them about FMLA and other such. But Congress, and Your Honor, I'm running out of time, may I answer that question? Congress has dictated certain notices, like the five in one posters that are in the break room in this courthouse and everywhere else. Congress has never, never, never dictated there be notices of section 19. We've argued many reasons in addition to this in the brief we ask that you affirm. Thank you. Thank you, Mr. G. Assessor. Mr. Khan, your rebuttal. Thank you, Your Honor. We have a fundamental disagreement amongst counsel about what's the proper framework. And I think that it is very clear that the way to assess this claim, and therefore, Wells Fargo's motion for summary judgment, has to be within the Title VII framework. Is section 19 relevant? Sure, but only as to the way it informs how this claim should be assessed within this court's longstanding and well-established disparate impact framework. And as such, whether or not section 19 requires something is not what is at issue. The issue is that Title VII requires Wells Fargo, whenever it makes or implements a selection criteria, to make sure that if there is impact arising from that policy, that it tailor that policy in a way or consider alternatives so as to minimize impact. We're asking Wells Fargo here to treat its section 19 compliance practices no different than any other of its selection processes that are also subject to Title VII scrutiny, and need to comply with Title VII. Now, I think it's important to clarify again, what is the policy we're challenging? We're only challenging the policy as Wells Fargo implemented it. That was, they fired appellants and told them, you have a record that makes you ineligible for employment at Wells Fargo. That's all they did. That is the policy we challenge. We say that that results in disparate impact. Dr. Bendick's analysis confirms that. Where Wells Fargo's other behavior comes in is only to inform the court about other alternatives that it could have thought of, should have potentially thought of, but did not apply or consider when it was discharging our clients. As to the plausibility of complying, I think, as to these alternatives, again, within the framework, we only get to that point if Wells Fargo can prove that there is a business necessity. Again, they need to prove there is an irresistible need to summarily terminate, and they have to prove that they've searched for alternatives. They didn't do that. But as to the plausibility of these alternatives, Wells Fargo did them. They offered Richard Eggers continued employment and six months leave to go get a waiver. They did that at the exact same time that they fired summarily with no other information our clients. How hard is it for Wells Fargo to give people notice? To say, hey, we're firing you, but we're firing you because of Section 19, and there's this waiver process that you can apply to. They did that for Richard Eggers. They've done that for other individuals. There's no reason why they couldn't do it here. And finally, I would direct the court to Dr. Hughes' report, where she talks about methods where the court or the Wells Fargo could easily come up with a system of sponsorship that is manageable based on its own practices of assessing people based on honesty and integrity with their performance evaluations. Those are all things that are possible. We would ask that you reverse the district court's order. Thank you, Mr. Cohn. Thank you. Court thanks both counsel for your presence and the argument you provided to the court. The briefing you submitted will take your case under advisement. You may be excused.